LUCAS E. MOORE STAVE CO. *v.* WELLS.

[72 South. 228.]

1. MASTER AND SERVANT. *Liability for agent's tort. Slander. Libel per se. Qualified privilege. Business relations. Burden of proof.*

Where a servant uttered slanderous statements of his own accord, which had nothing to do with his employment and about which his master was not concerned and when he was not about his master's business, in such case the master was not liable in an action for slander.

2. LIBEL AND SLANDER. *Libel per se.*

Where defendant lumber company had contracted with plaintiff to buy staves, and agreed to make advancements to enable him to haul them, and on learning from a third party by letter that plaintiff had not paid for the hauling, so that his laborers were in want and had been fed by said third party, wrote in reply that "from the looks of the statement received from you this morning we cannot believe that Mr. Wells (plaintiff) has applied the money advanced to him for hauling and other expenses connected with the staves for the purpose for which we sent it," such statement was not libelous *per se.*

3. QUALIFIED PRIVILEGE. *Business relations. Burden of proof.*

In as much as such letter was not libelous *per se,* and it did not go beyond the exigencies of the occasion, the burden of proof was shifted to the plaintiff to prove malice in fact.

APPEAL from the circuit court of Montgomery county. HON. J. A. TEAT, Judge.

Suit by S. P. Wells against the Lucas E. Moore Stave Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*McClean & Rowe,* for appellant.

*Leftwich & Tubb, Hill & Witty,* and *W. F. Thompson,* for appellee.

COOK, P. J., delivered the opinion of the court.

This is a suit instituted by S. P. Wells, appellee, against the Lucas E. Moore Stave Company, appellant, for the alleged publication of an alleged libelous letter. The second count of the declaration charges that one of the employees of the defendant stave company uttered slanderous statements which gravely reflected upon the honesty of the plaintiff. There was another count in the declaration which was excluded from the jury's consideration by the instructions of the trial court.

In reference to the second count, we merely desire to say that the statement attributed to Mr. Lantrip was purely voluntary, had nothing to do with his employment, and whether it was false and slanderous did not concern appellant. In other words, the alleged agent was not about the master's business when he uttered the words imputed to him.

The record discloses that plaintiff had a contract with defendant whereby he undertook to manufacture and sell to defendant staves, and whereby defendant contracted to pay plaintiff certain prices for the staves when delivered, and, in the meantime, to enable plaintiff to carry out his contract defendant agreed to, and did, make advance payments when the staves were yarded. This contract was in process of performance and had been performed in

part by both parties—a part of the staves had been delivered and the advancements had been made by defendant—when defendant, on July 21st, received the following letter from one H. Ingram, a "general merchant and cotton buyer," doing business at Kilmichael, viz.:

"Inclosed please find claims to the amount of one hundred and fifty-nine dollars and six cents, O. K. by Mr. Wells. It seems that Mr. Wells would not pay these parties for their hauling, so they was needing their money to buy something to eat. I let them have something to eat. They was here Sat., and Mr. Wells still refused to pay them, so they wanted to attach the staves here on the ground. Thinking you would pay them, I talked them out of the notion of attaching the staves, until I could hear from you. So they turned their claims over to me, as per itemized statement by them and your Mr. Wells. If you desire to pay this claim and want to pay it through me and have any doubt about the parties getting their money, will have the Bank of Kilmichael make you a bond for this amount and fix it any way you desire. Hoping you will appreciate my position in the matter and understand what I did was to prevent them from attaching staves, until I could hear from you. Would thank you to let me hear from you at once."

To this letter the manager of the defendant corporation made this reply, viz.:

"Columbus, Miss., 7/22/13. Mr. Henry Ingram, Kilmichael, Mississippi—Dear Sir: We have your favor of the 21st inst, inclosing statement of the amounts S. P. Wells is due various parties in your section for hauling staves. We cannot decide on the moment what is the best thing for us to do in this matter until we find out the total indebtedness now outstanding against the stock.

"We are in receipt of another letter from a party who has a claim of thirty-five dollars against these staves and we have no idea how many others who have similar claims.

"In commencing to do business with Mr. Wells we made a contract with him whereby we were to advance a stipulated amount per M pieces as the staves were made and yarded and further advance for dressing and hauling to the railroad. We have accepted his statements as to amounts of stock actually made and yarded and we find that after the business is practically wound up that we have advanced on a great many more staves than he actually had as is evidenced by bills of sales that we now hold covering the stock made.

"At the present time Mr. Wells' debit balance stands on our books as one thousand and fifty-three dollars. This, of course, includes an old amount made while working the Oliver timber last year and year before last amounting to about six hundred and eighty dollars. We wrote him a few days ago to get all the dressed staves that he had hauled to the railroad so that we could count them up and see where we stand, but so far we have been unable to get any satisfaction from him at all, as he does not write giving us any information whatever as regards the progress being made getting the staves to the railroad ready to ship. ·

"We do not feel justified under the circumstances of making any further advances or payments against his stock, until we know definitely what he has. If you will kindly find out and let us know whether or not all the dressed staves have been hauled to the railroad and are now ready to be counted and loaded we will go down and check the staves up and if we find that it is to our interest to pay off this indebtedness we will do so.

"We believe it would be unwise to have a large number of attachments run against his staves at the present time, as cost and other expenses connected with these proceedings would eat up whatever value they have. We strongly advise those who have been hauling to go ahead and put every stave there is to the railroad and we will then let you know what we can do after we know what we can do after we know what is right. From the looks

of the statement received from you this morning we cannot believe that Wells has applied the money we have advanced to him for hauling and other expenses connected with the staves to the purpose for which we sent it, for between the 5th and 12th of July we sent him two hundred and fifty dollars to pay for hauling, besides other amounts sent him previous to this.

"We would be glad to have you co-operate with us in straightening out this tangle and we will do all we can to keep the matter out of court. Yours very truly, Lucas E. Moore Stave Company, W. V. Grace, Manager."

The writing and publication of this letter forms the basis of plaintiff's cause of action, if he has any cause of action against the defendant. The case went to the jury, and a judgment was, upon the verdict of the jury, entered in favor of the plaintiff and against the defendant for the sum of one thousand dollars.

The defendant, appellant here, claims that the letter in question was not libelous *per se,* and that it was written under circumstances which made it a qualified privileged communication.

We have carefully examined the evidence and have been unable to find any evidence which would warrant a conclusion that it was written with malice, or with any intention to injure the reputation of the defendant. The letter was written in response to a letter which demanded a reply, and the language employed was, in no sense, abusive; nor is there any charge directly preferred against the honesty of the plaintiff. Mr. Ingram's letter called for a reply, and it seems that nothing was said in the letter which was not justified by the facts then in the possession of the writer.

Mr. Ingram was informed the state of plaintiff's account as it appeared on the books of defendant. Plaintiff declined to make further advances, but promised to send a man to check up plaintiff's staves then on hand, and, after this was done, the defendant would make fur-

ther payment if it was found that business prudence authorized this course.   Then the writer said:

"From the looks of the statement received from you this morning we cannot believe that Mr. Wells has applied the money advanced to him for hauling and other expenses connected with the staves to the purpose for which we sent it."

A glance at Mr. Ingram's letter will demonstrate that he had painted a rather gloomy picture.   The laborers were hungry, because Mr. Wells had refused to pay them. Mr. Ingram acted the part of the good Samaritan and fed them, and still, according to Mr. Ingram, Mr. Wells was obdurate, and "refused to pay them."   No excuse for Mr. Well's refusal to pay was given by Mr. Ingram. Upon the whole, and in the light of the information available to the writer of the letter, it does seem to us that the writer acted with commendable restraint.

What at last did the alleged libelous letter charge against the plaintiff?

The statement was conditional.   The writer merely said to his correspondent:

We can see no reason why Mr. Wells refuses to pay his debts.   We have advanced him sufficient money to pay his laborers, and we will have to investigate this matter before committing ourselves to further advancements, as our books show that he should have the funds with which he could pay the laborers, and it would seem that he has not used the money already advanced to pay the claims for which the same was intended.

The authorities, as a rule, define "libel" as a false and unprivileged publication which exposes any person to hatred, contempt, ridicule, or obloquy, to which may be added, "or which causes him to be shunned or avoided, or which has a tendency to injure him in business."

Again, turning to this case.   It seems that the charge here was, at most, that Mr. Wells had used the money paid him under a contract for other purposes than they were intended to be used under the contract.   There is

111 Miss.—51

nothing here to warrant an inference of criminality or dishonesty. The moneys to be advanced under the contract were not trust funds. Mr. Wells could have used the funds in some other ventures without incurring the suspicion of dishonesty or breach of trust; the statement complained of was conditional—the publication was privileged, and there is nothing in the evidence warranting the belief that there was any malice in fact which prompted the statement made by appellant's manager, *Railway Co.* v. *Brooks,* 69 Miss. 168, 13 So. 847. The plaintiff himself said that he may have used some of the money advanced for other purposes; but, however that may be, a careful consideration of the record convinces us that plaintiff did not prove his case.

Inasmuch as the letter was not libelous *per se,* and it did not go beyond the exigencies of the occasion, the burden of proof was shifted to the plaintiff to prove malice in fact, and this burden he failed to sustain.

*Reversed and remanded.*